Filed 1/21/16  P. v. Harrington CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BRIAN WILLIAM HARRINGTON,<br><br>      Defendant and Appellant. | B255185<br><br>(Los Angeles County<br>Super. Ct. No.GA084500) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stanley Blumenfeld and Michael D. Carter, Judges.  Affirmed in part.  Reversed and remanded in part with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Brian Harrington appeals from the judgment entered following his conviction by jury of multiple crimes related to his imprisonment and rape of his sometime girlfriend in her home between October 4 and 5, 2011. Defendant asserts multiple bases for appeal, including the court's refusal to grant his request to replace his retained counsel during the trial, instructional error, erroneous evidentiary rulings, an improper division of a single course of conduct into two false imprisonment counts, and several sentencing errors. We agree that his conviction on one of the two false imprisonment counts must be reversed, and remand for resentencing. We otherwise affirm.

## FACTUAL AND PROCEDURAL HISTORY

A. *Procedural Background*

Defendant was charged by information with the following counts: first degree burglary with a person present (Pen. Code, § 459)[1] (counts 2, 13, and 14); forcible rape (§261, subd. (a)(2)) (count 3); attempted forcible oral copulation (§§ 664/288a, subd. (c)(2)) (count 4); dissuading a witness by force or threat (§ 136.1, subd. (c)(1)) (count 5); criminal threats (§ 422, subd. (a)) (count 6); assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)) (count 7); false imprisonment (§236) (counts 8 and 9); vandalism over $400 (§ 594, subd. (a) (count 10); and solicitation of murder (§ 653f, subd. (b)) (count 12). The information further alleged that counts three and four were committed in the commission of a burglary within the meaning of section 667.61, subdivisions (a), (b), (d), and (e).

At the conclusion of trial, the jury found defendant guilty of rape, attempted forcible oral copulation, both counts of false imprisonment, and vandalism (counts 3, 4,

---

[1] All further statutory references herein are to the Penal Code unless otherwise indicated.

2

8, 9, and 10), as well as the lesser included offense of simple assault (§ 240) on count 7. The jury found defendant not guilty of the remaining counts and allegations.

The trial court sentenced defendant to a total term of 16 years and 10 months in prison—the upper term of eight years on count three, a consecutive upper term of four years on count four, a consecutive six month term on count seven, a consecutive term of three years on count eight, and consecutive eight month terms (one-third the midterm) each on counts nine and ten. Defendant timely appealed.

B. *Prosecution Case*

1. *Defendant's Relationship With Catherine[2]*

As of October 2011, defendant and the victim, Catherine, had been involved in an on-and-off dating relationship for about four years. Catherine testified that initially defendant was kind to her and her two young children, but defendant drank a lot and had a "very angry temper." He told Catherine that he was a former Navy Seal and a former police officer and that he worked for Blackwater. When he drank too much, defendant would become "very volatile, very condescending" and would verbally abuse Catherine. Defendant would become angry and say "I am the police. Nobody can do anything for you." As a result, Catherine testified that she was afraid of defendant and "didn't know where to turn." Defendant told her that since he was a Navy Seal, "he could snap [her] neck easily," that she would not leave the relationship unless she had "a tag on [her] toe," that he could use anything as a weapon, and he could kill her with a pencil.[3] In fact, the parties stipulated that defendant had "never been employed as a sworn peace officer by any law enforcement agency or any military organization."

---

[2] Catherine was referred to by her first name during the trial for privacy reasons. We adopt the same convention; no disrespect is intended.

[3] Catherine stated that she believed defendant's representations about his past because, among other things, he had government stickers on his car, kept separate cell phones, claiming one was for his "business with Blackwater," claimed to be on missions constantly, and would dress in military fatigues.

At his urging and based on his claim that he was a loan broker, defendant also became involved in Catherine's finances. About a year into their relationship, she gave him around $175,000 of her money to invest. She also gave him money to pay her mortgage, because he claimed he was handling a loan modification on her home. She never received her investment, or money, back from defendant. When Catherine started to question defendant about the finances, he told her "you will never see your money again."

Catherine testified that she repeatedly attempted to break off their relationship due to defendant's abusive behavior, but she then resumed the relationship because defendant would start to act more kindly toward her and she hoped to be able to get her money back. The weekend prior to the incident, they took a short vacation together, which Catherine believed defendant had paid for, but it turned out he had used her credit card. The weekend went well, defendant said that he had stopped drinking, and Catherine wanted to resume dating him. They had consensual sex that weekend.

2. *Incident on October 4 and 5, 2011*

On October 4, 2011, Catherine and defendant had plans to go to dinner. Her children were with their father. Defendant arrived at her house with his driver. When she got into the car, defendant seemed lethargic and his demeanor seemed "off." He said he had had a tough day at work and then fell asleep for most of the ride.

At the restaurant, defendant drank and became agitated. He loudly called Catherine a "whore" and a "stupid cunt," and accused her of seeing other men. Defendant continued to drink during dinner, and continued his loud and offensive behavior. Catherine tried to calm him and asked him to stop. Eventually, she ran out of the restaurant and told defendant's driver: "Please take me home. He's drinking. I am really scared. I want to get out of here." The driver waited for defendant, who told him not to leave. Catherine waited in the car while defendant went back inside to pay the bill. When he returned, defendant began to "berate" and yell at Catherine. He told her they were going to get married and that she could no longer communicate with her ex-

4

husband. Catherine responded "I'm not marrying you. You scare me and I want you to get away from me."

When they arrived at Catherine's house, she ran out of the car and told defendant not to follow her and to leave her alone. He followed her, saying that he would not leave her alone. Catherine entered her back door and closed and locked it. Defendant began to bang on the glass portion of the back door and she thought it might break. Defendant said that he would calm down if she let him in, that he just wanted to talk. Catherine agreed to let him in, hoping he would "be reasonable" and "go away." Once inside, defendant began yelling at Catherine again. Catherine ran to the front of the house, opened the front door and called to the driver, "Please, please, come help me. Brian is being really crazy and I'm afraid." The driver went to the back door and spoke to defendant. She could not hear their conversation but asked the driver to take defendant with him. The driver then left the premises but he left defendant's car in Catherine's driveway, blocking her car.

Defendant became angry again, telling Catherine "you're my woman. You're going to be with me." Catherine said she would call the police if he did not leave, and defendant said "You are not going to do any such thing." He grabbed her cordless phone and said she was not going to call anyone. At some point, he also took her cell phone. Defendant told Catherine he could snap her neck, which made her "really scared." She testified that she thought he was going to kill her, "because he was just so violent and so angry and he had threatened to do so, so many times before." She ran into her bedroom and locked two locks on the bedroom door, including a deadbolt. She took off her dress and changed into a T-shirt, shorts, and a robe. Defendant began banging on the door, saying "You stupid bitch, you better let me in." Catherine told him to leave. He started pushing on the door so hard that the frame started coming off and Catherine tried to brace it with her weight to keep it from breaking. The door frame split off the hinge and defendant entered the bedroom. Catherine grabbed a camera and took several photographs of defendant as he entered the room, pushed the broken door aside, and grabbed her. The photographs were shown to the jury at trial.

5

Catherine tried to fight him off by hitting, kicking, and doing "whatever I could to get him off of me." Defendant grabbed her and was shaking and yelling at her. Sometimes he would throw her to the ground, and at one point her head slammed against a clock on the floor. Catherine kept telling him to leave. Defendant also put his finger in her mouth and shook her head like a rag doll, causing a cut to the interior of Catherine's mouth. He also put Catherine in a choke hold. When she was on the ground, Catherine curled up into the fetal position to protect herself. She testified that it would then "quiet down a bit and then he'd start yelling, getting angry, shaking and it would start up again." Defendant screamed "You're my woman. You are not going anywhere. You are not calling the cops. I am the cops. You can't do anything without me." Catherine testified that the assault continued off and on throughout the night.

At one point, defendant allowed Catherine to get an ice pack from the kitchen for her neck. He followed her, and made her return to the bedroom. Catherine laid down on the bed with the ice pack and defendant would "either lay down next to me or stand over me and watch me." Catherine stated she was "never out of his gaze" the entire night. Catherine had to use the bathroom during the night, and defendant went with her. Catherine stated she did not feel she could leave. At some point in the early morning, Catherine grabbed her car keys with the intent of leaving. Defendant told her, "You are not going anywhere." Catherine saw that her car was blocked in by defendant's car. At this point, she "pretty much gave up." She was exhausted, in extreme pain and "didn't have any more fight" in her, so she "curled up in a ball" on the bed. Defendant laid next to her and watched her. Neither of them slept.

In the morning, Catherine felt sick and needed to use the bathroom. While she was sitting on the toilet, defendant came into the bathroom and "took his penis out and tried to put it in [her] mouth." He began rubbing his penis "all over [her] face" and said that she "needed to suck his cock." Catherine said "don't" and turned her face away. She felt "horrid" and "sick" and told him to get away from her and "get out of here" and that she was sick. She told him "no" repeatedly. After several minutes, defendant backed away to let Catherine wipe herself. She then went back to the bedroom.

6

Catherine had been trying to find a way that defendant would let her out of the house, and she decided to use an appointment with her chiropractor as an excuse to leave. Defendant let her use the phone, and she called her son, ostensibly to remind him about a morning practice. Defendant stood next to her during the call. When defendant was not looking, she also texted his driver for help, saying that she was hurt. She also called her chiropractor and made an appointment. She was too afraid to call the police, because defendant always had told her that he knew all of the police officers. In addition, defendant told her that night that he would kill her if she called the police.

After she used the phone, defendant turned to Catherine and said "you are not getting out of here until you get fucked." Catherine told him "I am in so much pain and I am hurt, just leave me alone. Just go away." Defendant started getting "angry and excited" and told her "you are going to like this." He removed her shorts, positioned her on her back on the bed and raped her for five to ten minutes.

Afterward, Catherine got up and tried to be as quiet as possible, hoping defendant would let her leave. Defendant told her he would get the door fixed so "there wouldn't be any evidence of what had happened." He agreed to let Catherine leave and moved his car so that she could drive out of her driveway. Catherine thought about calling the police as soon as she drove away, but she was scared and in "shock," so she drove around for a while.

At 9:55 a.m., Catherine called her friend, Jennifer Bradley. She told Bradley what had happened, and Bradley told her to call the police.[4] Catherine asked Bradley to take pictures of the broken door. Bradley agreed and said she would watch Catherine's children that day after school.

Next, Catherine went to the chiropractor. She testified that she did not go to the police at that point because she was still in shock and still afraid defendant would hurt her

---

[4] Catherine's testimony was inconsistent regarding whether she told Bradley she had been raped, or just attacked, during their first phone conversation on October 5, 2011. Bradley testified that Catherine did not tell her about the rape until they met in person that afternoon.

or her children. Her chiropractor, Dr. Mike De Napoli, observed bruises on Catherine's arms, hands, feet, neck, breasts, and the side of her face, as well as scratch marks. It also appeared that she had not slept. He asked her what had happened. Catherine said "I guess my ex-boyfriend doesn't like being an ex-boyfriend anymore." She also told Dr. De Napoli that defendant had ripped her bedroom door off its hinges.

After leaving the chiropractor, Catherine spoke with Bradley, who told her not to go home because defendant was still in the house. During the course of the morning, Catherine spoke to defendant during a series of phone calls in which he apologized. He also promised to give her the money he owed her and stated he would do a wire transfer into her account. During one phone conversation, defendant asked Catherine to meet him and said he would "explain everything." He said he would "take care of everything." Catherine agreed to meet in a public place. That afternoon, they met in the parking lot of a grocery store. Catherine stayed in her car, and defendant asked her to let him in because it was raining and he needed to show her some paperwork related to the money transfer on his iPad. Catherine agreed to let him into the car and noted that defendant was behaving calmly. Defendant then left. Catherine never received any of her money.

Catherine also testified that she received a call from her credit card company regarding an unpaid bill, which defendant had promised to pay. She received this call before she went to the police on October 5.

Once her children were out of school that afternoon, Catherine met Bradley at her house, so Bradley could watch the children while Catherine went to the police.

3. *Investigation*

Catherine reported the assault and rape to the San Marino Police Department later in the day on October 5, 2011. Her multiple bruises were photographed. She also agreed to submit to a sexual assault exam. That examination was conducted at 11:00 p.m. on October 5, 2011. Toyetta Beukes, a sexual assault response team director, testified regarding extensive bruising she observed on Catherine's left and right arms, her wrists, her breast, her legs and feet, as well as a scratch along her left jawline and a bruise on her chin. Catherine also complained of soreness in her neck, back, throat, knees, and vagina,

8

nausea, headache, and lightheadedness. Her injuries were consistent with sexual assault and strangulation. Semen from Catherine's vaginal swab contained defendant's DNA.

Catherine subsequently learned that her home was in foreclosure, because defendant had not made the promised mortgage payments for approximately 15 months. She also discovered that defendant had been writing checks on her bank account without her permission.

4. *Prior Incidents*

Catherine and her friend Jennifer Bradley testified regarding several prior incidents with defendant. Once, while they were not dating, defendant showed up in Yosemite while Catherine was vacationing there with her children. He told her he could find her wherever she went and knew what she was doing. On another occasion, Catherine and Bradley took their children to an indoor playground called Jump 'n Jammin. Defendant started calling her cell phone constantly, almost every 15 seconds. After the group moved to a restaurant, defendant showed up, sat down at the table, and said "You can't hide from me. I know where you are." Catherine and Bradley went to the ladies' room to get away from him, but he followed them inside. They left the restaurant and took their children to get yogurt nearby. Defendant followed, argued with Catherine outside the shop and knocked a container of food from her hand. Defendant then blocked her car from leaving the parking lot, saying "you are not going anywhere without me."

Approximately three or four months prior to the incident in October 2011, when Catherine asked defendant about her money, he picked her up "and kind of threw me in the air and my head hit the ceiling." Around the same time, she got a second cell phone she could use for her friends and family without defendant's knowledge. She testified that she did so because she was hoping that he would repay her money, and thus did not want to cut off all communication with him, and also thought they could remain friends.

In March of 2011, Catherine and one of her sons ran to Bradley's house, located about a quarter mile from Catherine's home. Catherine said that defendant was "after her" and was chasing her. Defendant showed up a few minutes later. Catherine was

9

surprised and told Bradley, "He's going to kill me. He's in the CIA." As Bradley described it, defendant was in a "belligerent drunken state," and wanted to talk to Catherine. He grabbed her by the arm and pulled her. Defendant and Catherine argued and Bradley could see Catherine was frightened.

C. *Defense*

Defendant testified in his own defense. He admitted that he was not a sworn police officer, agent with the DEA, FBI, or CIA, and had never worked for Blackwater. He also admitted falsely telling people he had worked for those organizations. He said that he told those lies to Catherine "just to make my resume sound better." Defendant also acknowledged that he had several prior felony convictions, including three for grand theft. He also had "one or more" DUI arrests.

Catherine and defendant began an exclusive dating relationship around 2007. He described his relationship with Catherine and her children as "excellent." He denied telling Catherine that he could snap her neck or that he was above the law. Instead, he claimed that he said, "I can snap necks. I can teach you to snap necks." Similarly, he claimed he stated he could teach Catherine to kill someone "with a paperclip, with a pencil," rather than threatening her as such. He denied ever picking Catherine up so that she hit her head on the ceiling. He admitted that he had said "unkind words" to Catherine and that he was a heavy drinker.

Defendant also admitted that within four to five months of beginning their relationship, he looked at Catherine as "somebody who had [$400,000] or $500,000 in liquid assets that . . . I could use" to maintain their lifestyle, as well as to "maintain my other household." During his relationship with, and unbeknownst to, Catherine, defendant lived with and supported another woman named Claudia. Catherine gave him about $250,000 to invest, but he never gave her a return on that investment or any of her investment back. Catherine was not aware that the money she gave him was not invested. He lied and pocketed the money, then spent it on "Catherine, myself, and my own household."

10

Regarding the Jump 'n Jammin incident, defendant stated that he went to the restaurant that day because Catherine had said she would be there. He saw Catherine and the children at a table and said, "Where the fuck have you been? I've been calling you." He acknowledged that he followed Catherine partway into the ladies' room, and later that he purposefully knocked a container of food from her hand outside the yogurt shop. He also admitted showing up at Bradley's house looking for Catherine on another occasion, but denied that they argued and stated that they had agreed to go to a basketball game together and then did so.

In the summer of 2011, there was a "lull" in their relationship. They resumed dating in September 2011. The weekend before the incident, they went on vacation to Santa Barbara. He paid $1,400 a night for two nights in a suite at the Four Seasons Hotel. They had consensual sex. He then spent that Sunday night at Catherine's house and had dinner there with her and her children on Monday, October 3.

Defendant testified that he took one of Catherine's sons to school on October 4, 2011, the day of the incident. That night, they went to dinner. They arrived at the restaurant around 9:30 pm and had a "low key argument," accusing each other of infidelity. Defendant drank three shots of whisky and Catherine had three glasses of wine. On the car ride home, they continued to argue. Catherine said that he was "getting too big for [his] britches." Defendant said he wanted to marry her. They began to discuss his recent weight loss and he said that Catherine was trying to keep up with him and was starving herself. Catherine asked "aren't you going to spend the night?"

When they arrived at Catherine's house, they went into the kitchen. Catherine went to check the mail and said "this fucking loan modification better be out there." At the time, defendant claimed he was in the process of working on the loan modification for Catherine's house and had been working on it for about eight months and the mortgage payments were 14 months in arrears. Catherine knew about the process. When Catherine returned to the kitchen, they began to argue about the loan modification.

Catherine then went to the bedroom and closed the door. According to defendant, he "bashed in the door with my shoulder like I have done before" and "helped myself in

11

the room." He claimed he did not know the top lock was locked. Catherine was still dressed and was "pissed" about the broken door. She grabbed a camera and said "Asshole. You think you're hot. I'm going to show you you're not hot." She went into the bathroom and he followed. She began ranting and raving and then started kicking him. Harrington grabbed her wrists to hold her back. They struggled for about 30 seconds, she kicked him a few times and he turned her around. Defendant denied throwing her to the ground. He walked her into the bedroom and sat her on the bed. Catherine began to calm down. He told her she was acting crazy because she was not eating and had been up for 24 hours. They then fed Catherine's dogs and defendant said he would take care of the door the next morning.

Defendant got into bed. Catherine washed her face, undressed, and got under the covers. They were not intimate. Defendant stayed dressed on top of the covers and was planning to get up for an early morning appointment.

Defendant denied taking Catherine's cell phone. The next morning, they got up for the day around 6:45 a.m. Catherine took care of the dogs and made some phone calls. Around 7:45, they were sexually intimate. Defendant claimed they had sex twice and oral sex. None of the acts were forced upon Catherine. They both left the house at the same time.

Catherine went to the chiropractor and defendant went home. Catherine left him a voicemail around 10:00 a.m. They agreed to meet later in the supermarket parking lot. Defendant claimed they planned to get coffee inside the store. After that meeting, Catherine texted defendant about a credit card issue. He told Catherine he had paid the bill, but he had not. Catherine was upset when she learned the truth about that bill that day. Earlier in the day, Catherine learned about an article on the internet reporting other instances of loan modification fraud by defendant. Defendant acknowledged at trial that he falsely represented himself to a credit card company as Catherine's husband, using her last name. He admitted he was a "con artist."

Defendant testified that, while in jail, he asked a fellow inmate, Larry Montez, to threaten Catherine and make her recant her story before the preliminary hearing. He

12

described Montez as "right out of central casting" and planned to have Montez approach Catherine at her home, acting as the "muscle," to scare her into recanting. He wrote a series of messages, or "kites," to Montez describing this plan and providing Catherine's name and address and the names of her children and parents. He denied any intent to kill Catherine.

## DISCUSSION

A. *Defendant's Request for New Counsel*

Defendant contends the trial court deprived him of the right to counsel of his choice by refusing to consider his "motion" to discharge his retained counsel. The Attorney General counters that defendant never made any such motion and, even if he had, the trial judge was well within his discretion to deny it midway through the trial. We agree with the Attorney General and therefore affirm.

1. *Factual Background*

During several pretrial conferences, defendant expressed concerns to the court about the preparedness of his privately-retained counsel, Anthony Brooklier. For example, at a hearing on March 27, 2013, defendant stated that he had not seen his defense counsel since his last court appearance (one month prior), and his counsel had not visited him in the county jail since September 2012.[5] Defendant also told the court that the defense was "not anywhere near prepared for trial," as they had not spoken with any experts and had a "laundry list of discovery" they had not yet received.

On April 15, 2013, Brooklier indicated to the court that defendant "doesn't think we're ready." Defendant then told the court, "We have not done any investigation on this case," and that he had not seen Brooklier since September 2012. Brooklier responded "that's absolutely not true. I don't know what he's talking about," and indicated that he had notes of his meetings with defendant. The court noted defendant's concern regarding readiness for trial and set a further conference.

---

[5] Brooklier was not present at this hearing or several others, as he was engaged in another trial. Defendant was represented by Gevork Chilingaryan, standing in for Brooklier.

13

At the next hearing on May 6, 2013, defendant (represented by Chilingaryan) again stated that he had not had any discussions with Brooklier since the hearing in February 2013, which lasted only four minutes. Defendant repeated that "no preparation" had been done on his defense. He also informed the court that he had hired his own investigator. At a follow-up hearing on May 10, 2013, the court noted defendant's concerns to Brooklier and inquired whether the defense was ready for trial. Defendant stated that he had "about 18 items" he needed to speak to Brooklier about "before [he] fe[lt] the matter should go anywhere," including a possible *Pitchess* motion and issuing subpoenas to witnesses. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531.) Defendant also told the court that he had not seen Brooklier "for more than three hours in 19 months." He then stated that if he could have five hours to meet with Brooklier, he would be "ready to go to trial."

On December 11, 2013, defendant told the court he had met with Brooklier "and he is 100 percent prepared and we're ready to go"

Trial commenced on January 17, 2014. On the second day of trial, after Catherine finished testifying, defendant moved "to make a *Marsden* hearing." (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) The court cleared the courtroom, except for defendant and both counsel, and then told defendant that a "*Marsden* motion is for appointed counsel." After confirming that Brooklier was privately retained, the court stated: [¶] "Then I'm not going to interfere with the attorney-client relationship. That is a private matter that you two have to work out. It will be up to you, what you want to do with your attorney. You hired him. You can do what you want with him." Defendant then asked the court what his "remedies" were. The court responded: "I'm not here to advise you. You have to talk to your attorney about it." The court then reiterated that it was not going to "get into the middle of it." The court explained: [¶] "When you hire your own attorney, what happens between you and your attorney is between you and your attorney. It's not something that the court can interfere with. I did not hire him. I cannot fire him. And I can't tell him what to do. I can't get in between what happens between you two. That is all privileged."

14

When defendant asked again what his "remedies in trial" were, the court told defendant to "go in the back" and "have a conversation" with Brooklier, and defendant replied, "That's all I want."

After a twenty minute recess, trial resumed without further comment on this issue.

2. *Legal Principles*

A criminal defendant "has the due process right to appear and defend with retained counsel of his or her choice. [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 152 (*Lara*).) This "right to counsel of choice reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).)

But a defendant's right to discharge his retained counsel "is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ortiz, supra*, 51 Cal.3d at p. 983.) The trial court "must exercise its discretion reasonably: 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.' [Citation.]" (*Id.* at p. 984.)

Thus, "a defendant may discharge his retained counsel of choice at any time with or without cause," subject to the above considerations. (*Lara, supra*, 86 Cal.App.4th at p.152.) By contrast, a defendant who wishes to substitute his or her court-appointed counsel must show good cause for that request, made in the form of a *Marsden* motion. (*Ortiz, supra*, 51 Cal.3d at p. 980, fn. 1, citing *Marsden, supra*, 2 Cal.3d at p. 123.)[6]

3. *No Error in Trial Court's Response to Defendant's "Marsden" Request*

Defendant argues that his statement to the trial court that he wanted "to make a *Marsden* hearing" was a clear indication that he wished to replace his current counsel,

_____

[6] Specifically, under *Marsden*, "a defendant must make a sufficient showing that denial of substitution would substantially impair his constitutional right to the assistance of counsel," and a trial court deprives a defendant of his constitutional right to counsel when it "denies his motion to substitute one appointed counsel for another without giving him an opportunity to state the reasons for his request." (*Ibid.*)

15

and that the trial court erred in denying that motion and refusing to even hold a hearing on the issue pursuant to *Ortiz*. But the trial court here did not deny any request by defendant to dismiss his counsel. Instead, the court first clarified for defendant that a *Marsden* motion would not apply to his retained counsel, and then explained defendant's right to "do what you want" with Brooklier, including firing him. The court further emphasized several times that it was defendant's choice whether to fire Brooklier. Defendant then accepted the court's suggestion that he talk with his counsel, stating that was "all [he] want[ed]." Consistent with that statement, defendant did not raise any further issues with his counsel during the trial. Thus, while this exchange certainly gave the court a clear indication that defendant had complaints regarding his counsel, the circumstances never developed into a motion for substitution or led to denial of such a motion. Accordingly, the trial court's actions did not violate defendant's right to counsel of his choice.

Analogizing to *Lara, supra*, defendant contends that his colloquy with the trial court regarding Marsden was sufficient "to place the trial court on notice that Harrington wished to have Brooklier relieved as counsel." In *Lara*, the defendant's retained counsel informed the court on the first day of trial that the defendant wanted to raise some conflicts the two had been having; counsel further stated that he had a "feeling" it was probably a *Marsden* motion. (*Lara, supra*, 86 Cal.App.4th at p. 146.) The trial court then conducted a hearing and ultimately denied defendant's request, finding he had not shown the good cause required under *Marsden*. (*Lara, supra*, 86 Cal.App.4th at pp. 146-148.) After confirming that a request by defendant to discharge retained counsel should not have been subject to a *Marsden* inquiry, the court considered the threshold question of whether the defendant had actually requested to discharge his counsel. (*Id*. at pp. 155-156.) Calling it a "close question," the court concluded that he had, relying on the trial court's "factual interpretation of the situation" as involving a request to discharge defense counsel, as evidenced by the fact that the trial court actually conducted a *Marsden* hearing. (*Id*. at pp. 157-158.) In *People v. Lucky* (1988) 45 Cal.3d 259 (*Lucky*), by contrast, after defendant's attorney informed the court that the defendant was attempting

16

to hire a new attorney, due to a difference in opinion, the court granted a continuance to allow defendant to explore that possibility. (*Id*. at p. 280-281.) The defendant did not hire a new attorney, never raised any further objections, and confirmed to the court that he did not have any complaints about starting trial in a week. (*Ibid*.) The Supreme Court rejected the defendant's claim that the trial court improperly refused to hold a *Marsden* hearing, and held that the defendant never requested to discharge his court-appointed counsel. (*Id*. at pp. 281-283.)

We conclude the exchange between defendant and the trial court here falls closer to the circumstances in *Lucky* than those in *Lara*. As in *Lucky*, here, the trial court gave defendant time to discuss his complaints with his counsel, after which time the issue appeared to be resolved.[7] Without further indication from defendant, the trial court was not obligated to proceed on a motion to substitute counsel that had not been made. And unlike the court in *Lara*, the trial court here did not conduct a hearing (under either *Marsden* or *Ortiz*) or otherwise indicate that he was considering (or rejecting) a claim by defendant to dismiss his counsel. Accordingly, we find no error in the trial court's conduct here.

B. *Instructional Error*

Defendant contends the trial court erred in failing to instruct the jury regarding a good faith belief in consent defense to the charged sex offenses and by including an instruction allowing the jury to make adverse inferences from his failure to explain or deny certain matters. We disagree.

1. *No Error in Omission of "Mayberry Defense" Instruction*

Defendant argues that the jury should have been instructed that if he harbored a reasonable and good faith belief that Catherine consented to their sexual encounter (the so-called "*Mayberry* defense"),[8] that belief is a defense to the charged sex offenses. He further contends that because the trial court has a sua sponte duty to instruct on such a

---

[7] We disagree with defendant's claim that he did not raise the issue again because doing so would have been futile. The record does not support that contention.

[8] *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*).

17

defense, where applicable, the failure to do so here was prejudicial error. We conclude that because there was no evidence of equivocal conduct by Catherine that would raise the viability of this defense, the trial court's failure to instruct on it was not in error.

The trial judge instructed the jury with the standard instructions on forcible rape (CALCRIM No. 1000) and attempted forcible oral copulation (CALCRIM No. 1015). Defendant argues that the court should have included the following optional language from CALCRIM No. 1000:

> "The defendant is not guilty of [forcible rape or attempted forcible oral copulation] if he actually and reasonably believed that the woman consented to the act. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the [woman] [other person] consented. If the People have not met this burden, you must find the defendant not guilty."

Defendant did not request this instruction (or otherwise object) at trial.

The California Supreme Court recognized the defense of mistaken belief as to consent in *Mayberry*, holding that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape. "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361(*Williams*) (footnotes omitted).)

18

Importantly, the defense of actual consent and the *Mayberry* defense (good faith belief in consent) are "two distinct defenses. Where the defendant claims that the victim consented, the jury must weigh the evidence and decide which of the two witnesses is telling the truth. The *Mayberry* defense, on the other hand, permits the jury to conclude that both the victim and the accused are telling the truth." (*People v. Romero* (1985) 171 Cal.App.3d 1149, 1155.) In other words, under the *Mayberry* defense, the jury could believe the victim's version of events but also find that defendant had a reasonable and good faith belief, based on evidence of equivocal conduct by the victim, that the victim had consented.

The trial court has a sua sponte duty to instruct on a defense, "even in the absence of a request, 'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) A *Mayberry* instruction "should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*Williams, supra,* 4 Cal.4th at p. 362.)

In *Williams*, *supra*, 4 Cal.4th at p. 362, the court found that there was no substantial evidence supporting a *Mayberry* instruction. The defendant's testimony, if believed, established actual consent by the victim. On the other hand, the victim "testified that the sexual encounter occurred only after Williams blocked her attempt to leave, punched her in the eye, pushed her onto the bed, and ordered her to take her clothes off, warning her that he did not like to hurt people. This testimony, if believed, would preclude any reasonable belief of consent. These wholly divergent accounts create no middle ground from which Williams could argue he reasonably misinterpreted Deborah's conduct." (*Ibid.*; see also *People v. Burnett* (1992) 9 Cal.App.4th 685, 690 [if "defense evidence is unequivocal consent and the prosecution's evidence is of non-consensual forcible sex, the [*Mayberry*] instruction should not be given"]; *People v. Rhoades* (1987) 193 Cal.App.3d 1362, 1369 [neither account of sexual encounter was

19

evidence that defendant mistakenly believed victim consented even though she did not-"sexual act was [either] entirely consensual or the obvious product of force"].)

Similarly, here, there was no substantial evidence of equivocal conduct warranting an instruction as to reasonable and good faith, but mistaken, belief of consent to intercourse or oral copulation. Catherine testified that she told defendant "no" and to leave her alone repeatedly throughout the encounter, that defendant assaulted her on and off for hours causing extensive bruising, and that she made several attempts to flee and/or lock him out. Defendant testified, on the other hand, that they had consensual sex and denied the assault. Based on the evidence, it would not be possible for the jury to believe Catherine and also believe that defendant harbored a reasonable and good faith belief that she was consenting to his sexual advances. Accordingly, we conclude the trial court did not have a sua sponte duty to give a *Mayberry* instruction.

2. *Instruction Regarding Adverse Inferences Was Proper*

Defendant also argues that the court improperly instructed the jury using CALCRIM No. 361 as follows: "If the defendant failed in his testimony to explain or deny any evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

As an initial matter, this claim is forfeited, as defendant failed to object to the proposed instruction at trial. (See *People v. Jennings* (2010) 50 Cal.4th 616, 671.) Moreover, even if we were to reach this claim, we would conclude that any error was harmless.

Defendant claims the instruction should not have been given, as he "admitted, denied or explained virtually all of the prosecution's evidence." "It is error to give this instruction in the absence of evidence in the People's case which is within the defendant's particular knowledge to explain and to which no explanation is offered." (*People v. Marsh* (1985) 175 Cal.App.3d 987, 994.) "If he fully accounts for his

20

whereabouts and denies the crime, the mere fact that defendant's story is contradicted by other prosecution evidence does not pave the way for giving the instruction, because contradiction is not by itself a failure to explain or deny. [Citations.] However, if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury. [Citations.]" (*People v. Mask* (1986) 188 Cal.App.3d 450, 455]; see also *People v. Belmontes* (1988) 45 Cal.3d 744, 784, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; but see *People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [instruction "is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear"].)

The Attorney General argues that defendant's explanations regarding the extent of bruising Catherine suffered and the extensive damage to the bedroom door from his purported attempt to nudge it open with his shoulder are so implausible they should be considered as no explanation at all. Defendant counters that he was extensively cross-examined on these topics and either gave explanations or stated that he did not know, which is all that is required to negate this defense.[9] Even assuming that the instruction was given in error here, we conclude that any such error would be harmless.

Any error in giving CALCRIM No. 361 is only prejudicial if it is reasonably probable a more favorable verdict would have resulted if the instruction had not been given. (*People v. Saddler* (1979) 24 Cal.3d 671, 683-684; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, the evidence implicating defendant was overwhelming. Catherine testified at length and in great detail regarding the incident and the prior history

---

[9] We note that this instruction has been met with some recent "hostility," leading one court to caution that "it will always be unwise of a trial court to include it among its general instructions without prior inquiry of the parties concerning it. In fact, today it should not even be requested by either side unless there is some specific and significant defense omission that the prosecution wishes to stress or the defense wishes to mitigate." (*People v. Haynes* (1983) 148 Cal.App.3d 1117, 1119-1120.)

21

of domestic violence by defendant, and her allegations of assault, imprisonment, and rape were largely corroborated by physical evidence and supporting witnesses. Defendant's description of events was often inconsistent with the other evidence and he admitted lying to Catherine and attempting to hire someone in prison to frighten her to change her story. Moreover, the jury was instructed as to the limitations of the inference—that any such inference would be insufficient to establish guilt and that inference was only to be used if applicable. We presume the jury understood and followed these instructions. (*People v. Danielson* (1992) 3 Cal.4th 691, 722, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) No reversal is warranted.

C. *Alleged Errors in Admission and Exclusion of Evidence*

Defendant contends the trial court committed the following evidentiary errors: (1) excluding texts from Bradley, Catherine's friend, to defendant regarding Catherine's credit card bill; (2) restricting defense counsel's cross-examination of Bradley on the same topic; and (3) admitting evidence regarding defendant's fraudulent conduct against third parties. He further contends these errors violated his due process rights and deprived him of a fair trial. We find no error.

1. *Legal Principles*

We review a trial court's rulings on the admissibility of evidence under the abuse of discretion standard. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.) Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair. [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## 2. *No Error in Exclusion of Evidence Regarding Bradley's Texts*
### a. *Factual Background*

During defendant's cross-examination of Bradley, defense counsel began to question her regarding text messages she had sent to defendant on October 7, 2011, several days after the incident. In the texts (which were not ultimately introduced at trial), Bradley stated she was contacting defendant about Catherine's tax returns that were never filed or provided to the bank and "she needs them ASAP to stop the foreclosure of her home. She also knows you put a stop on the North Star transfer and closed the account. If you care anything about those boys, you will not render them homeless." In its initial questioning on this issue, defense counsel elicited from Bradley that she sent defendant a text regarding Catherine's tax returns because she was "trying to help Catherine sort out the myriad of fallout from the defendant," and Catherine had asked her to send the text. The court then took its morning recess, and outside the presence of the jury, asked defense counsel about the relevance of post-event communications from Bradley. Defense counsel explained that the texts were relevant to show Catherine was "only concerned about the monetary situation" and that the stopped payment on her credit was the "final straw" that led Catherine to fabricate the sexual assault report.

The court held that the texts were not relevant, as they were sent after Catherine reported the rape to the police, and noted that Catherine had already testified she was concerned about the money. The court also indicated there was no evidence that Catherine or Bradley knew that defendant had stopped a credit card payment (the purported "final straw") at the time she reported the rape. The court asked defense counsel for an offer of proof regarding any such evidence, which counsel could not give. The court then granted defense counsel's request for on Evidence Code section 402 hearing on the issue.

During the 402 hearing, Bradley testified that she believed she got the information from Catherine regarding the credit card on October 7, 2011, the same day she sent the texts to defendant. She stated that she could not recall learning anything about that issue

23

any earlier, but did not believe they discussed anything about the credit card on October 5, the day of the incident.

Defense counsel then pointed out to the court that the phone records showed Catherine receiving a call from the credit card collection agency at 11:50 a.m. on October 5, 2011, and that Catherine called Bradley five minutes later. The court noted that defense counsel could argue their theory that Catherine was angry about the credit card issue, including the inference arising from the phone records that she told Bradley about the issue on October 5, but that it was "excluding any further questions regarding text messages sent to the defendant on this subject after the reporting to the police." Under Evidence Code section 352, the court found the probative value of the texts was "next to zero and that the time consumption and the confusion that it may cause the jury outweighs any possible probative value." In response to defense counsel's suggestion that it would take "less than a minute" to cross-examine Bradley on this point, the court noted that his concern was not the time it would take defense counsel, but rather the confusion to the jury and then the additional time it would take for the prosecution to respond.

### b. *Trial Court Did Not Abuse Its Discretion*

Defendant argues, as he did below, that the text messages and associated cross-examination of Bradley were key pieces of evidence highly probative of Catherine's credibility and her motivation for filing charges against defendant. On the other hand, the undue consumption of time was, in defendant's view, not a serious concern, given the narrow parameters of the issue and defense counsel's time estimate.

We conclude that the trial court, after careful and extensive review of the issue, was well within its discretion to exclude the evidence as minimally probative under Evidence Code section 352. As articulated by defendant, the evidence was relevant on two points: when Catherine learned about the credit card issue and her anger about it. With respect to the first point, the text messages themselves did nothing to shed light on whether either Catherine or Bradley learned about the stopped payment prior to Catherine's report to the police on October 5. Similarly, Bradley's testimony at trial and

24

during the 402 hearing confirmed that she either did not know when she found out about the credit card, or believed that she did so on October 7. Thus, we agree with the trial court's assessment that the probative value of the texts on this point was "next to zero." In fact, the admitted cell phone records likely provided a stronger inference that Catherine knew of the credit card issue prior to her police report than any testimony by Bradley denying the same.

On the issue of Catherine's anger, the text messages by Bradley added little. As the trial court noted, Catherine had admitted during her testimony that she was upset about the stopped payment on the credit card, and defendant testified about a text Catherine sent him herself on October 5 about that issue. Thus, additional evidence regarding texts sent through Bradley several days later had minimal probative value beyond the evidence already introduced.

Further, while defendant focuses on the short amount of time he claims it would have taken for his counsel to cross-examine Bradley on the issue, he discounts the trial court's consideration of the total time it was likely to take for both sides to explore an issue that it determined had minimal probative value. The trial court "has broad discretion under Evidence Code section 352 to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.]" (*People v. Mills* (2010) 48 Cal.4th 158, 195.) The trial court properly exercised its discretion in performing that balancing here. We also note that defense counsel was able to elicit some initial testimony regarding the nature of the text messages and the fact that Catherine directed Bradley to send them, which the court refused to strike over the prosecution's objection. Thus, the trial court did not abuse its discretion in finding that the minimal value of allowing defense counsel to continue his inquiry on this subject was outweighed by concerns such as confusion of the jury and the undue consumption of time.

For all of these reasons, we also find that any error in excluding this evidence would have been harmless, given the other evidence defendant could have relied upon to

argue the inference that Catherine was motivated by anger over the credit card problems in accusing defendant of sexual assault, the limited value of the text messages in establishing that point, and the strength of the evidence supporting Catherine's version of events. Thus, it was not reasonably probable that the jury would have reached a more favorable result with the admission of the text messages and the related cross-examination of Bradley. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

3. *No Error in Admission of Financial Misconduct*

Defendant contends that the trial court erroneously allowed the prosecutor to cross-examine him regarding his theft of money from unrelated parties. He claims this evidence was irrelevant and highly prejudicial. We find no error, and further, that any possible error was harmless.

During her cross-examination of defendant, the prosecutor asked defendant whether he "stole money from other people." Defense counsel objected, but the trial court overruled the objection. Defendant then responded that he had. The prosecutor followed up with several more questions, over defense counsel's continued objections, confirming that multiple other people were texting defendant at the time of his arrest demanding the return of money he had taken from them. Defendant admitted that was true.

Defendant now argues that the trial court erred in overruling his objections to this evidence, as his financial misconduct with other parties was unrelated to the charges in this case and was highly damaging to his credibility and therefore highly prejudicial. Crucially, defendant recognizes that the evidence was properly admissible as probative of his credibility under Evidence Code section 1101, subdivision (c), which allows admission of evidence "offered to support or attack the credibility of a witness." Despite its admissibility, he contends that the trial court should have found that its minimal relevance—in light of other evidence of his prior convictions— was outweighed by its highly inflammatory nature, and therefore should have excluded it under Evidence Code section 352. We disagree. The evidence was clearly relevant to defendant's credibility, an issue defendant himself calls one of the crucial elements of the case. The trial court

was within its discretion to determine that the value of this evidence outweighed any prejudice to defendant.[10] We will not disturb the trial court's determination in weighing the admissibility of evidence absent a clear abuse of the court's broad discretion. We find none here.

Even if we found the evidence was erroneously admitted, any such error was harmless under *Watson, supra*, 46 Cal.2d at p. 836. Apart from the evidence challenged here, there was significant evidence of defendant's financial misdeeds. Defendant himself had already testified regarding an article on the internet accusing him of loan modification fraud, and admitted elsewhere in his testimony that he was a con artist, had several convictions for grand theft, essentially viewed Catherine as a bank account with liquid assets that he could spend on himself and another woman, falsely represented himself as Catherine's husband to the credit card company, took hundreds of thousands of dollars from Catherine, lied to her, and never repaid her, among other acts. We fail to see how the handful of questions challenged here added damage to defendant's credibility in any meaningful way. As such, we cannot find that it was reasonably probable that a result more favorable to defendant would have resulted had the additional evidence of fraud on other parties not been admitted. (*People v. Welch* (1999) 20 Cal.4th 701, 750.)

D. *Challenge to Evidence Code section 1109*

While defendant does not challenge the admissibility of "evidence of the defendant's commission of other domestic violence" under Evidence Code section 1109, he does challenge the statute itself, claiming it violates his due process and equal protection rights. Defendant recognizes that the California Supreme Court rejected such a challenge to the similar provision in Evidence Code section 1108 (*People v. Falsetta* (1999) 21 Cal.4th 903, 912-913 (*Falsetta*)) and that subsequent court decisions have consistently applied *Falsetta* to "uphold section 1109 against similar due process and equal protection challenges." (See, e.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1236, fn. 16; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026-1029; *People v.*

---

[10] We note that the trial court did sustain defense counsel's objections and cut off the prosecutor's questioning when it became duplicative.

*Jennings* (2000) 81 Cal.App.4th 1301, 1314; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419–420.) Instead, he urges that we "reconsider" *Falsetta* in light of *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769 (*Garceau*), a case involving a jury instruction regarding evidence of other crimes in a homicide trial. We are not bound by decisions of lower federal courts (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3), and to the extent *Garceau* conflicts with *Falsetta*, we are bound by the latter (see, e.g., *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455). Moreover, we are not persuaded by defendant to depart from our prior jurisprudence on this issue.[11]

E. *Challenge to Second Count of False Imprisonment*

Defendant next contends that the alleged false imprisonment involved a continuous course of conduct that should have been subject to one, rather than two, charged violations. We agree and reverse the second count (count nine) on that basis.

Defendant was convicted of two counts of false imprisonment, one for alleged conduct on October 4, 2011 (count eight) and one for alleged conduct on October 5, 2011 (count nine). But his restriction of Catherine's movement was a single, continuing course of conduct beginning on the evening of October 4 and ending when he allowed Catherine to leave her home the following morning. As a result, there is but one act of false imprisonment and accordingly, there can be but one conviction.

This principle was aptly demonstrated in *People v. Thomas* (1994) 26 Cal.App.4th 1328. In *Thomas*, the victim was kidnapped in a mall parking structure. The defendant forced her into her car and demanded money and her ATM card. He then began to drive to the victim's apartment so that she could retrieve her ATM card, but stopped, parked, and repeatedly raped the victim. The defendant then drove to the apartment, where the victim called the police. (*Id*. at pp. 1331–1332.) The defendant was convicted of, among other crimes, two counts of kidnapping with intent to commit robbery. The prosecution's theory was that the first kidnapping ended when the defendant stopped the car and raped

_____

[11] Indeed, defendant acknowledges in his reply that he has asserted this argument on appeal "principally to preserve the issue for possible federal review."

the victim, and a second kidnapping occurred when the defendant drove the victim from the site of the sexual offenses to her apartment, "intending to rob her of her ATM card." (*Id*. at p. 1334.) The court of appeal reversed, holding that there was "a single abduction, followed by a continuous period of detention." (*Id*. at p. 1335.) "That [the defendant] may have changed his approach or focus as to the robbery, uttered a variety of threats to the victim, and engaged in other crimes after the initial abduction did not transform the offense into two kidnappings." (*Ibid*.; see also *People v. Masten* (1982) 137 Cal.App.3d 579, 588, disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8 ["as long as the detention continues, the crime [of kidnapping] continues"].)

Similar to kidnapping, the crime of false imprisonment has been recognized as having a "continuous character." (*People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 820; see also *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 410.) The evidence here demonstrates a single, continuous overnight detention and therefore cannot support charges for two separate acts of false imprisonment. We are unpersuaded by the Attorney General's argument that the two counts represent false imprisonment based on two different motives or objectives—the first count reflecting defendant's restriction of Catherine's movement on the evening of October 4 "so that she would not be able to leave his presence," and the second count reflecting his restriction the next morning, for the purpose of sexual assault. This argument is unsupported by any authority suggesting that such an undivided course of conduct may properly result in two convictions for the same offense due to an alleged change in motive. Accordingly, defendant's conviction of a second act of false imprisonment (count nine) must be reversed.

F. *Sentencing Issues*

Finally, defendant challenges two aspects of his sentence. First, he argues that the false imprisonment and rape counts alleged conduct with a single objective, which should have been subject to only one sentence under section 654. We disagree and affirm. Second, defendant raises an error in his sentence on the conviction for attempted oral copulation, a point the Attorney General concedes. We therefore remand for resentencing on this issue.

1. *Sentencing Under Section 654*

Defendant contends that his act of false imprisonment was merely a means to facilitate a sexual assault, and therefore argues that the false imprisonment sentences must be stayed pursuant to section 654. The Attorney General did not address this issue in its brief on appeal.[12] However, we conclude that substantial evidence supports the trial court's implied determination that these offenses were based on multiple criminal objectives, and therefore that section 654 does not apply.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The test of "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground as stated in *People v. Correa* (2012) 54 Cal.4th 331.) Thus, if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. (*Ibid*.) If, on the other hand, defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

The determination of whether defendant acted pursuant to a single intent and objective is a factual one, and we uphold the trial court's determination where supported

---

[12] Instead, it appears that the Attorney General mistakenly believed defendant was arguing that he should be subject to only one sentence on his two false imprisonment counts.

by substantial evidence. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438.) If there is no express finding on the issue in the record, a finding that the crimes were divisible is inherent in the judgment and must be upheld if supported by the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1147.)

Defendant contends that he cannot be sentenced for both false imprisonment and rape and/or attempted oral copulation, because the sole purpose for the false imprisonment was to facilitate the sexual assault. In support of that contention, he cites cases where courts have stayed false imprisonment sentences based on a finding that the defendant harbored a singular intent and objective of perpetrating sexual assault, and the imprisonment was simply a means to accomplish that objective. (See, e.g., *People v. Latimer* (1993) 5 Cal.4th 1203 [evidence did not suggest any intent or objective behind the kidnapping other than to facilitate the rapes]; *People v. Wall* (1979) 95 Cal.App.3d 978, 990 [single intent where defendant drove victim a few blocks, parked, and then raped her].)

Here, by contrast, there was evidence that defendant may have had more than one intent when he imprisoned Catherine in her home. From defendant's conduct and statements, it could reasonably be inferred that his initial objective was to physically assault Catherine. Notably, he neither attempted nor even referenced any intent to commit a sexual assault until the morning of October 5, many hours after his initial act of false imprisonment. Thus, the circumstances here are distinguishable from those in the cases defendant cites, and are in line with those allowing consecutive sentences. (See, e.g., *Ratcliffe*, *supra*, 124 Cal.App.3d at p. 818 [affirming imposition of consecutive terms for kidnapping, rape and oral copulation based on multiple objectives].)

Thus, the record supports the trial court's implied findings. There was sufficient evidence that defendant harbored different objectives in committing first the false imprisonment and then the sexual assault. We therefore affirm.

2. *Conceded Error on Count Four*

In supplemental briefing, defendant contends that the trial court erroneously sentenced him to a full, consecutive upper term on his conviction for attempted forcible

oral copulation pursuant to section 667.6, subdivisions (c) and (d). But as defendant points out, and the Attorney General concedes, the sentencing provisions in section 667.6 do not apply to attempted sex offenses. (See § 667.6, subd. (e) [listing applicable offenses]; *People v. Rodriguez* (2012) 207 Cal.App.4th 204, 217.) Accordingly, this sentence was in error and the matter is remanded for resentencing.

## DISPOSITION

The judgment is reversed with respect to count nine for false imprisonment and insofar as it imposes a sentence on count four pursuant to section 667.6. The case is remanded to the trial court for resentencing and modification of the abstract of judgment consistent with this opinion. The judgment is otherwise affirmed. The clerk of the superior court is instructed to deliver a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

32